IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CITY OF MOUNT HOLLY, WILLIAM TERRY, and MARK CARVER<br><br>　　　　　　Defendant. | Civil Action File No.: |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Atlantic Specialty Insurance Company ("ASIC"), for its complaint against the Defendants alleges as follows:

**INTRODUCTION**

1.

This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 for the purpose of resolving an actual controversy between and among ASIC, The City of Mount Holly (the "City") and William Terry ("Terry"), in his Individual and Official capacity under an insurance policy issued by ASIC to the City. In this action, ASIC seeks a declaration that it has no obligation to defend or indemnify the City and Terry in connection with the underlying lawsuit in which Mark Carver ("Carver") alleges that the City and Terry, among other parties, are liable for his violating his due process rights under the 14th Amendment and 42 U.S.C. § 1983.

**THE PARTIES**

2.

Atlantic Specialty Insurance Company is a New York corporation engaged in the insurance

168903945.3

Case 3:26-cv-00125　　Document 1　　Filed 02/17/26　　Page 1 of 18

business with its principal place of business located at Plymouth, Minnesota. ASIC is authorized to transact business and has transacted business in the State of North Carolina.

3.

Defendant City of Mount Holly, Gatson County, North Carolina is a municipal corporation created pursuant to the laws of the State of North Carolina, and is a body corporate subject to suit. The City may be served through its Mayor, David Moore or City Manager, Jonathan Blanton, both located at 400 E. Central Avenue, Mount Holly, North Carolina 28120.

4.

Defendant William Terry, at the times relevant here, was a detective with the Mount Holly Police Department, located in Gatson County, North Carolina and is a citizen of the State of North Carolina. He can be served at 2120 Linwood Road, Gastonia, North Carolina 28052.

5.

Defendant Mark Carver is a citizen of the State of North Carolina. He can be served at 203 Nolen Street, Gastonia, North Carolina 28056.

**JURISDICTION AND VENUE**

6.

This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332, as it between citizens of different states and meets the amount in controversy.

7.

ASIC is a New York corporation engaged in the insurance business with its principal place of business located at Plymouth, Minnesota.

8.

Mount Holly is a City located in Gatson County in the State of North Carolina.

9.

William Terry is and was at the time of the filing this lawsuit a citizen of the State of North Carolina.

10.

Mark Carver is and was at the time of the filing this lawsuit a citizen under the laws of the State of North Carolina.

11.

Accordingly, there is complete diversity of citizenship between the Defendants, on the one hand, and ASIC, on the other.

12.

ASIC issued eight (8) separate policies that are at issue in this matter, and each policy has a potentially applicable primary limit of $1,000,000 and seven (7) of the policies have a potentially applicable excess liability coverage limits of $4,000,000, and one (1) of the policies has a potentially applicable excess liability coverage limits of $3,000,000 .

13.

The City and Terry have demanded that ASIC defend them and agree to indemnify them under the ASIC policies for the claims by Carver.

14.

Thus, the amount in controversy in this lawsuit exceeds $75,000 exclusive of interests and costs.

15.

This Court has personal jurisdiction over all Defendants because they all reside in North

Carolina and are citizens of the State of North Carolina.

16.

Venue is proper in the Western District of North Carolina, the judicial district in which Mount Holly is located and where Carver and Terry reside, pursuant to 28 U.S.C. § 1391(b)(1).

17.

This action is properly filed pursuant to 28 U.S.C. § 2201 because an actual controversy of a ripe and justiciable nature exist among ASIC, the City and Terry involving the scope and extent of ASIC's duty to defend and/or indemnify the City and Terry for claims being asserted in the lawsuit brought by Carver.

**FACTS**

18.

ASIC hereby incorporates by reference all allegations contained in Paragraphs 1 – 16 above as if fully set forth herein.

19.

On August 8, 2025, Carver filed a lawsuit styled *Mark Carver v. City of Mount Holly; Andrea Williams as executor for the Estate of Karen Winningham; Kristin Huges; David Crow; William Terry; William Stetzer; Kevin Murphy and Jim Workman*, filed in the United States District Court Eastern District of North Carolina, Raleigh Division, Civil Action Number 5:25 CV 478 (the "Underlying Lawsuit"). A true and correct copy of the Underlying Lawsuit is attached as Exhibit A.

20.

The Underlying Lawsuit alleges that on May 5, 2008, two jet skiers discovered a woman's

body on an embankment of the Catawba River. (Ex. A. at ¶ 16.)

21.

The Underlying Lawsuit alleges that the Mount Holly Police Department (MHPD) was dispatched to the scene after a 911 call was received by the Gatson County Communications Center. (*Id*. at ¶¶ 17-19.)

22.

The Underlying Lawsuit alleges that upon arrival, the investigators determined that the body was Ms. Yarmolenko, a student at the University of North Carolina at Charlotte (UNC-C). (*Id*. at ¶ 20.)

23.

The Underlying Lawsuit alleges Ms. Yarmolenko's body was found next to her car on the embankment, and that she had been strangled to death with three ligatures that came from within her vehicle (the "Incident"). (*Id*. at ¶¶ 21-25.)

24.

The Underlying Lawsuit alleges that when the officers arrived at the crime scene, both of the driver side doors were open, and were still open when MHPD lead detective, William Terry, arrived. (*Id*. at ¶ 34.)

25.

The Underlying Lawsuit alleges that on May 6, 2008, an autopsy was performed, which concluded that Ms. Yarmolenko died from asphyxiation secondary to ligature strangulation. (*Id*. at ¶ 41.)

26.

The Underlying Lawsuit alleges that throughout the Summer of 2008, law enforcement personnel with MPHD and the Gatson County Police Department (GCPD) conducted investigations regarding the Incident. (*Id*. at ¶¶ 34-51.)

27.

The Underlying Lawsuit alleges that on the morning of May 5, 2008, Carver was fishing with his cousin, Neal Cassada ("Cassada") on the Catawba River. (*Id*. at ¶ 52.)

28.

The Underlying Lawsuit alleges that Cassada left the fishing spot between 12:00 p.m. and 1:00 p.m. while Carver continued to fish by himself. (*Id*. at ¶ 59.)

29.

The Underlying Lawsuit alleges that around 2:15 p.m., Officer Robert Ellison ("Officer Ellison") with MHPD approached Carver, who was still fishing in the spot he had been at for several hours. (*Id*. at ¶ 60.)

30.

The Underlying Lawsuit alleges that Carver provided his identification to Officer Ellison and informed him that Cassada had been with him earlier; Carver also provided Cassada's contact information. (*Id*. at ¶ 61.)

31.

The Underlying Lawsuit alleges that on May 15, 2008, Carver voluntarily gave a statement to the investigators, telling them that he and Cassada had been at the river the day of the Incident to fish. (*Id*. at ¶ 66.)

32.

The Underlying Lawsuit alleges that on October 6, 2008, Carver and Cassada voluntarily

provided buccal swabs and fingerprints to law enforcement. (*Id*. at ¶ 67.)

33.

The Underlying Lawsuit alleges that Carver is illiterate, did not complete high school, and his reading and spelling skills reflect a first-grade level. (*Id*. at ¶ 69.)

34.

The Underlying Lawsuit alleges that after the October 2008 interview with Carver, North Carolina State Bureau of Investigation Crime Lab ("SBI Crime Lab") ran DNA testing of Carver's DNA sample. (*Id*. at ¶ 78.)

35.

The Underlying Lawsuit alleges that this DNA sample was low-quality, and that based on missing data and manipulation of testing to reach a certain result, the DNA testing results should not have been reported as a match to Carver. (*Id*. at ¶ 81.)

36.

The Underlying Lawsuit alleges that another DNA sample was similarly manipulated so the SBA Lab analysts could claim they could not exclude Carver from the sample. (*Id*. at ¶ 84.)

37.

The Underlying Lawsuit alleges that these results were provided to the Mount Holly Police Department on December 10, 2008. (*Id*. at ¶ 86.)

38.

The Underlying Lawsuit alleges that on December 10, 2008, Carver was interviewed by Terry and other law enforcement personnel. (*Id*. at ¶ 88.)

39.

The Underlying Lawsuit alleges that on December 12, 2008, Carver was arrested and

interrogated by an SBA Agent. (*Id*. at ¶ 92.)

40.

The Underlying Lawsuit alleges Carver was ultimately convicted for the Incident and spent nearly ten years in prison for a crime he did not commit. (*Id*. at ¶ ¶ 99; 118.)

41.

The Underlying Lawsuit alleges that Carver's conviction was vacated by a judge of the North Carolina Superior Court, and the North Carolina Court of Appeals dismissed an appeal by the State. (*Id*. at ¶ ¶ 120-21.)

42.

The Underlying Lawsuit alleges that on August 12, 2022, a newly elected District Attorney in Gatson County dismissed the charges against Carver. (*Id*. at ¶ 123.)

43.

In Count III, the Underlying Lawsuit sets forth a Section 1983 claim for misrepresentation of evidence violation of the Due Process Clause of the 14th Amendment against the City and Terry.[1]

44.

In Count IV, the Underlying Lawsuit sets forth a Section 1983 claim for unlawful seizure in violation of the 4th Amendment against Terry.

45.

In Count V, the Underlying Lawsuit sets forth a Section 1983 claim for malicious and wrongful prosecution in violation of the 4th and 14th Amendments against Terry.

---

[1] While the Underlying Lawsuit contains a total of eleven counts against various other defendants not relevant to this action, only the six counts pertaining to the City and/or Terry are listed.

168903945.1 - 8 -

46.

In Count VI, the Underlying Lawsuit sets forth a Section 1983 *Monell* claim for violations of the Fourth and Fourteenth Amendment based upon policies and procedures against the City.

47.

In Count IX, the Underlying Lawsuit sets forth a Section 1983 *Monell* claim for violations of the Fourth and Fourteenth Amendment based upon training against the City.

48.

In Count XI, the Underlying Lawsuit sets forth a Section 1983 claim for bad faith failure to investigate in violation of the Due Process Clause of the 14th Amendment against Terry.

49.

ASIC is currently participating in the defense of the City and Terry in the Underlying Lawsuit pursuant to a full reservation of rights.

## **THE POLICIES**

50.

ASIC hereby incorporates by reference all allegations contained in Paragraphs 1 – 48 above as if fully set forth herein.

51.

ASIC issued eight consecutive Government Risk Package Policies to the City with the following policy numbers and effective dates (the "Policies"):

| | |
|---|---|
| 791-00-03-38-0000 | Effective 07/01/10 to 07/01/11 |
| 791-00-03-38-0001 | Effective 07/01/11 to 07/01/12 |
| 791-00-03-38-0002 | Effective 07/01/12 to 07/01/13 |
| 791-00-03-38-0003 | Effective 07/01/13 to 07/01/14 |
| 791-00-03-38-0004 | Effective 07/01/14 to 07/01/15 |
| 791-00-03-38-0005 | Effective 07/01/15 to 07/01/16 |

791-00-03-38-0006 Effective 07/01/16 to 07/01/17
791-00-03-38-0007 Effective 07/01/17 to 07/01/18

52.

Relevant here, the Policies all included Law Enforcement Liability Coverage ("LEL") with a policy limit of $1,000,000 for each wrongful act and a $3,000,000 aggregate.

53.

The Policies also provided Excess Liability Coverage. Policy 791-00-03-38-0000 has Excess Liability Coverage limits of $3,000,000 for each claim and a $3,000,000 aggregate. The remaining policies have Excess Liability Coverage limits of $4,000,000 for each claim and a $4,000,000 aggregate.

54.

Each of the policies contain the same Law Enforcement Liability and Excess Liability coverage forms.

55.

A true and correct copy of the Law Enforcement Liability and Excess Liability coverage forms, including the applicable declarations page for each policy is attached hereto as Exhibits B, C, D, E, F, G, H, and I, respectively.

**LEL Coverage Part**

56.

The insuring agreement in the LEL provides:

    **SECTION I — COVERAGES**

        **A.** **Insuring Agreement – Liability for Law Enforcement Wrongful Acts**

        1.    We will pay those sums in that the insured becomes legally obligated to pay as "damages" resulting from a "law

168903945.1 - 10 -

enforcement wrongful act" to which this insurance applies.

2. We will have the right, but not the duty to defend the insured against any "suit" seeking those "damages". We have no duty to defend the insured against any "suit" seeking "damages" for a "law enforcement wrongful act" to which this insurance does not apply. We may, at our discretion, investigate any "law enforcement wrongful act" and settle any "claim" that may result.

   However:

   a. The amount we will pay for "damages" is limited as described in **SECTION V — LIMITS OF INSURANCE**; and

   b. Our right to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS (SECTION I. B.).**

3. This insurance applies to "damages" resulting from a "law enforcement wrongful act" only if the "law enforcement wrongful act" was first committed:

   a. By an insured in the course and scope of their "law enforcement activities" for you and

   b. During the policy period.

4. We will consider each "law enforcement wrongful act" in a series of "related law enforcement wrongful acts" to have been committed on the date of the first "law enforcement wrongful act", including any continuation, change or resumption of such "law enforcement wrongful act".

This insurance applies to "damages" arising out of a "law enforcement wrongful act" committed anywhere in the world, but only if the insured's liability for "damages" is determined in a "claim" on the merits brought in the United States of America, including its territories and possessions and Puerto Rico; Canada; or in a settlement agreed to by us.

57.

168903945.1 - 11 -

Case 3:26-cv-00125    Document 1    Filed 02/17/26    Page 11 of 18

The LEL also provides the following relevant definitions:

**SECTION VII - DEFINITIONS**

****

2. "Claim(s)" means an oral or written demand, including a "suit" for payment of money "damages."

3. "Damages" means money damages. "Damages" does not include any amount awarded as liquidated damages pursuant to any federal or state statute nor the multiple portion of any multiplied damage award.

****

7. "Law enforcement activity(ies)" means:
   a. Any official activity conducted in the course of your law enforcement operations;
   b. Any officially sanctioned off-duty activity conducted in the course of law enforcement operations;
   c. Ownership, maintenance, operation or use of any premises by your law enforcement operations;
   d. Any criminal prosecution activity by judicial officers, prosecuting attorneys and staff, other than public defenders, criminal defense attorneys.

8. "Law enforcement wrongful act(s)" means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty by an insured arising from a "law enforcement activity".

****

12. "Related law enforcement wrongful acts" means any multiple, repeated, or continuous "law enforcement wrongful act" that is causally connected by facts or circumstances of a series of any "law enforcement wrongful acts" causally connected by the same facts or circumstances.

58.

The LEL provides the following exclusion:

**4. Criminal Acts**

Any "claim" arising directly or indirectly out of, or in any way related to a dishonest, malicious, fraudulent, or criminal act, or the willful violation of any

statute, ordinance or regulation committed by or with the knowledge of the insured.

However, we will defend the insured for a "suit" subject to the other terms of this coverage part until either a judgment or final adjudication established such an act or the insured confirms such an act.

This exclusion does not apply to "claims" of malicious prosecution.

**Excess Liability Part**

59.

The insuring agreement of the Excess Liability part provides:

**SECTION I - COVERAGE**

**A. Insuring Agreement — Excess Liability**

1. We will pay those sums that the insured becomes legally obligated to pay as "damages" in excess of all "underlying insurance", but only after all "underlying insurance" has been exhausted by the actual payment of the Limits of Liability of the "underlying insurance".

2. This excess liability insurance coverage is subject to the insuring agreement terms, exclusions, limitations, conditions, and definitions contained within the "underlying insurance" except as described in **SECTION III — EXCLUSIONS.**
3. The amount we will pay for "damages" is limited as described in **SECTION IV — LIMITS OF INSURANCE.**

60.

The Excess Liability part further provides:

**SECTION II — DEFENSE**

1. We have no duty to defend or assume charge of any settlement or defense of any "claim" made, "suit" brought, or proceedings instituted against the insured. However, we have the right, but not the duty, and will be provided the opportunity to associate with the insured in the investigation, settlement or defense of any "claim", "suit" or proceeding which in our opinion may create liability under this excess liability policy, whether or not the Limits of Liability of the "underlying insurance" have been exhausted.

168903945.1 - 13 -

2. If the defenses are included within the Limit(s) of Liability of any "underlying insurance" by the terms of that "underlying insurance", any defense expenses we incur under this policy in excess of that "underlying insurance" will reduce the applicable Limit of Insurance of this policy.

3. If the defense expenses are not included within the Limit(s) of Liability of any "underlying insurance" by the terms of that "underlying insurance", any defense expenses we incur under this policy in excess of that "underlying insurance" will not reduce the applicable Limit of Insurance of this policy.

61.

The Excess Liability part contains the following exclusion:

**SECTION III — EXCLUSIONS**

This insurance does not apply to:

****

3. **No Coverage Provided by Underlying Insurance**

Any "claim" which is not covered for any reason by any "underlying insurance" to this policy.

**FIRST CAUSE OF ACTION**
(Declaratory Relief of No Coverage Under LEL)

62.

ASIC hereby incorporates by reference all allegations contained in Paragraphs 1 – 61 above as if fully set forth herein.

63.

The insuring agreement for the LEL requires that in order for this insurance to apply to "damages" resulting from a "law enforcement wrongful act", the "law enforcement wrongful act" must be first committed:

    a.    By an insured in the course and scope of their "law enforcement activities" for you and

**b.** During the policy period.

64.

The insuring agreement for the LEL Coverage states that "[w]e will consider each 'law enforcement wrongful act' in a series of 'related law enforcement wrongful acts' to have been committed on the date of the first 'law enforcement wrongful act', including any continuation, change or resumption of such 'law enforcement wrongful act'".

65.

Policy number 791-00-03-38-0000 was the first policy issued to the City, and has effective dates of 07/01/10 to 07/01/11.

66.

The Underlying Lawsuit alleges that the City and Terry committed several "law enforcement wrongful acts" in the investigation and prosecution of Carver.

67.

These alleged "law enforcement wrongful acts" include, but are not limited, the unlawful arrest of Carver without probable cause on December 12, 2008. (Ex. A., at ¶ 92.)

68.

All of the "law enforcement wrongful acts" alleged in the Underlying Lawsuit are connected to the investigation, arrest, and prosecution of Carver.

69.

Under the Policies, all the alleged "law enforcement wrongful acts" in the Underlying Lawsuit are deemed to be committed first and collectively on the date of the first "law enforcement wrongful act", which is December 12, 2008.

70.

168903945.1 - 15 -

Since the first of ASIC's Policies was not issued until July 1, 2010, all the "law enforcement wrongful acts" alleged in the Underlying Lawsuit are deemed to have occurred prior to the beginning of any insurance policy issued by ASIC.

71.

Therefore, ASIC has no duty to defend or indemnify the City and Terry for the claims in the Underlying Lawsuit under the LEL Coverage for any of the Policies.

72.

In addition, ASIC has no duty to defend or indemnify the City or Terry under the LEL Coverage to the extent that the claims in the Underlying Lawsuit fall within the Criminal Acts exclusion.

**SECOND CAUSE OF ACTION**
(Declaratory Relief of No Coverage Under Excess Liability)

73.

ASIC hereby incorporates by reference all allegations contained in Paragraphs 1 – 72 above as if fully set forth herein.

74.

The Excess Liability insuring agreement only provides payment for "damages" in excess of "underlying insurance" after all "underlying insurance" has been exhausted by the actual payment of the Limits of Liability of the "underlying insurance".

75.

Excess Liability coverage is subject to the insuring agreement terms, exclusions, limitations, conditions and definitions contained within the "underlying insurance", unless modified by endorsement.

76.

Exclusion 3. of the Excess Liability Coverage bars coverage to any "claim" which is not covered for any reason by any "underlying insurance" to these Policies.

77.

For the same reason there is no coverage under the LEL Coverage, there is also no coverage under the Excess Liability Coverage.

78.

In addition, because there is no coverage afforded under the LEL Coverage, the only applicable "underling insurance", Exclusion 3. bars any coverage under the Excess Liability coverage.

79.

ASIC seeks a declaration that it does not have any obligation to defend or indemnify any of the Defendants for any damages, losses, claims, costs or expenses arising out of or related to the claims asserted in the Underlying Lawsuit on numerous grounds, including but not limited to:

(a) The Underlying Lawsuit does not fall within the insuring agreements of the LEL and/or Excess Liability coverage part because the alleged "law enforcement wrongful acts" were first committed prior to the issuance of any the Policies;

(b) There is no coverage under the LEL and/or Excess Liability coverage part due to the above cited exclusions in each policy part;

80.

WHEREFORE, ASIC demands judgment as follows:

A. For a declaration that ASIC has no duty to defend, indemnity or reimburse the City and Terry or otherwise pay for any damages, losses, claims, costs or expenses arising out of the claims asserted against in the Underlying Lawsuit;

B. For the costs of this suit; and

C. For such other and proper relief as this Court may deem just and proper.

This 17th day of February, 2026.

| | |
|---|---|
| **LEWIS BRISBOIS BISGAARD**<br>**& SMITH LLP**<br>600 Peachtree Street, NE<br>Suite 4700<br>Atlanta, Georgia 30308<br>404.348.8585 (Telephone)<br>404.467.8845 (Facsimile)<br>seth.friedman@lewisbrisbois.com | /s/ Seth M. Friedman<br>Seth M. Friedman<br>North Carolina Bar No. 46543<br>*Attorney for Plaintiff Atlantic Specialty Insurance Company* |